UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.-                                            21 Cr. 65 (LJL)

COLE JAMES BRIDGES,
    a/k/a "Cole Gonzales,"

                                   Defendant.


# THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Sam Adelsberg
Matthew Hellman
Assistant United States Attorneys
    *Of Counsel*

## <u>**TABLE OF CONTENTS**</u>

THE OFFENSE CONDUCT ................................................................................................ 4

   I. Overview of ISIS ..................................................................................................... 4

   II. Bridges Expresses Support for Jihad .................................................................... 7

   III. Bridges Agrees to Provide Advice and Training to ISIS Fighters ....................... 9

   IV. Bridges Provides Tactical Instructions for How to Defeat a U.S. Military Operation and Kill U.S. Soldiers in Support of ISIS ................................................................................ 20

   V. Bridges' Arrest and Post-Arrest Interview ......................................................... 34

THE GUIDELINES RECOMMEND A 40-YEAR SENTENCE ............................................. 36

ARGUMENT ................................................................................................................... 38

   I. The Section 3553(a) Factors Compel a 40-Year Sentence ................................... 38

     A. The Nature and Circumstances of the Defendant's Crimes ............................. 38

     B. The Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant ............................................................................................................ 43

     C. The Need to Promote General Deterrence and Respect for the Law .............. 48

   II. The Defendant's Remaining Sentencing Arguments Are Unpersuasive ............ 51

     A. A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities ...... 52

     B. The Totality of the Defendant's History and Characteristics Do Not Warrant Leniency 57

     C. The Court Should Reject the Defendant's Attempts to Minimize and Shift Blame ........ 60

CONCLUSION .................................................................................................................. 64

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................. 37

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) .............................................. 63

*United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) ................................... 54

*United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.) ................................ 53

*United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313 (E.D.N.Y. Mar. 31, 2021) ........ 49

*United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) ......................................... 54

*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) ............................................. 55, 56

*United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) .................................... 49, 54

*United States v. Doe*, 323 F. Supp. 3d 368 (E.D.N.Y. 2018) ................................... 48

*United States v. El Bahnasawy,* No. 16 Cr. 376 (RMB) (S.D.N.Y.) .......................... 54

*United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) ........................... 53

*United States v. Hester*, 17 Cr. 64 (W.D. Mo.) ....................................................... 57

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ...................................... 47

*United States v. Kang*, No. 17 Cr. 446 (D. Hawaii) ................................................ 57

*United States v. Kostadinov*, 572 F. Supp. 1547 (S.D.N.Y. 1983) ........................... 48

*United States v. Kourani*, 6 F. 4th 345 (2d Cir. 2021) ............................................ 54

*United States v. Melzer*, 20 Cr. 314 (GHW) (S.D.N.Y.) .......................................... 57

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) .......................................... 43, 46

*United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019) ................................... 56

*United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.) ........................................... 56

*United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) ....................................... 54

*United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.) ........................................ 52

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) .............................................. 47

*United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 ................................ 56

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ................................... 42, 43, 52, 55

*United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) ................................................ 54

## **Statutes**

18 U.S.C. § 1114 ........................................................................................................ 36, 37

18 U.S.C. § 1512(c)(1) ..................................................................................................... 55

18 U.S.C. § 1542 ............................................................................................................... 53

18 U.S.C. § 2339B .......................................................................................... 36,53,55,56,63

18 U.S.C. § 3553(a)(1) ..................................................................................................... 38

18 U.S.C. § 3553(a)(2) ..................................................................................................... 38

## **Rules**

U.S.S.G. § 3A1.4(a) .......................................................................................................... 43

## INTRODUCTION

The defendant, Cole Bridges, infiltrated the U.S. Army in service of a terrorist group and used his membership in the military to pursue a terrifying objective: the murder of his fellow U.S. servicemembers.  His conduct in support of the Islamic State of Iraq and al-Sham ("ISIS") — a terrorist group known for its violence and murdering Americans around the world — was deeply premeditated, highly calculated, and terrifyingly concrete.  He revealed sensitive military information and tactics to people he believed to be ISIS jihadists to enable them to murder fellow U.S. soldiers in an ambush.  Based on his crimes, the Sentencing Guidelines recommend a term of life imprisonment, which is curtailed here to 40 years' imprisonment because of the statutory maximum.  All of the factors relevant to sentencing strongly support a sentence of 40 years' imprisonment.

Contrary to the defendant's submission, the defendant's abhorrent and terrorist-supporting conduct did not begin when he met the FBI OCE.  Indeed, for months before that, while a member of the military sworn to defend the United States against enemies—very explicitly including ISIS—he proudly displayed a troubling and worsening affinity for terrorist organizations including ISIS.  Ultimately, after successfully infiltrating the U.S. military, declaring his support for jihad, and escalating in his radical ideology, Bridges started communicating with the OCE in late-September 2020 and took advantage of what he believed was an opportunity to take action in support of ISIS.  Bridges sprang into action, eager to teach combat skills and provide advice to ISIS members.  He disclosed maneuvers, tactics, and training meant to maximize the death of American soldiers in a discrete attack — soldiers just like the defendant and his platoonmates — all while noting his willingness to, in his words, "become a martyr." During this period, Bridges

1

accelerated his downloading and consumption of graphic jihadist videos.  He had developed into a hardened ISIS supporter eagerly willing to support jihadist forces in furtherance of their shared goals: killing as many U.S. soldiers as possible.  And when he had succeeded in that goal when he had provided information he hoped would help ISIS kill U.S. soldiers, Bridges gladly took a victory lap, filming a jihadist video promoting the ISIS attack on U.S. soldiers while wearing his U.S. Army body armor and standing in front of an ISIS jihadi flag.

The defense requests a sentence of time served, which would amount to less than four years' imprisonment. This request is utterly divorced from the reality of what the defendant did in this extraordinary case.  Beyond the remarkable request for a sentence more than 36 years below the Guidelines sentence, the defense, at every turn in its submission, attempts to minimize his conduct and shift blame in every direction, betraying the defendant's inability to accept responsibility for the full scope and gravity of his crimes.  But, as detailed further below, the facts here are clear: the defendant sought to further a violent terrorist group's revolting agenda while serving in the U.S. Army; he mapped out a devious, sophisticated, and treasonous ambush to murder fellow servicemembers; and he shared actionable U.S. Army tactics and maneuvers with purported ISIS members to effectuate the attack by jihadist terrorists.  There is simply no basis to vary downward from the Guidelines sentence of 40 years' imprisonment—the statutory maximum penalty, which caps a Guidelines recommendation that would otherwise be life imprisonment as a result of the gravity of Bridges' acts of terrorism.

All of the Section 3553(a) factors support a Guidelines sentence of 40 years' imprisonment in this case.  Such a sentence is necessary and appropriate to reflect the extremely serious and abhorrent nature of the defendant's offenses; to provide just punishment for his conduct; to deter

and prevent him from resuming his activities in support of the radical terrorist ideology that motivated his crimes; to protect the public from future acts of terrorism and violence by the defendant; and to deter others, including other young individuals and military members, from seeking to join dangerous extremist groups like ISIS. Bridges engaged in an appalling attempt to take up arms against his country and murder his fellow soldiers in cold blood. The Court should sentence him to 40 years' imprisonment.

## THE OFFENSE CONDUCT

The defendant attempted to use the training he received in the U.S. Army to provide material support to ISIS and to help its fighters kill U.S. soldiers in the Middle East. Bridges joined the U.S. Army in September 2019, and by the time of the offense conduct was stationed in Germany with the Second Cavalry—a unit active since 1836 that has seen action in conflicts including the Civil War, both World Wars, and, notably here, throughout the Global War on Terrorism. While deployed in Germany, Bridges continued his training and development as a cavalry scout. As a scout, Bridges received specialized training he later used in support of ISIS. Throughout his deployment, and well before he communicated with undercover investigators, Bridges displayed support for ISIS and jihadist violence, both online and in the real-world.

As described further below, Bridges attempted to assist ISIS by providing support, guidance, and training to people he believed were ISIS fighters. For example, he sent photos from U.S. Army training manuals, and described and diagrammed military maneuvers and tactics that could be used against U.S. troops in the Middle East. He advised on potential ISIS targets in New York City. Bridges also agreed to use his status as an ISIS member hiding inside the U.S. Army to amplify ISIS's message, creating a propaganda video in which he expressed his support for the ambush and killing of U.S. troops, and urged U.S. soldiers to pledge loyalty to ISIS. Bridges further lent his military training, perspective, and expertise in support of what he believed were an attack on, and a separate real-world ambush of, U.S. Army servicemembers by members of ISIS.

### I. Overview of ISIS

ISIS is a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On or about October 15, 2004, the U.S. Secretary of State designated al

Qaeda in Iraq ("AQI"), then known as Jama'at al-Tawhid wa'al-Jihad, as an FTO and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224. (Presentence Report ("PSR") ¶ 10).  On May 15, 2014, the Secretary of State amended that designation of AQI to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On or about September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.  ISIS leaders urge their followers to target Americans around the world.

On or about September 21, 2014, then-ISIS spokesman Abu Muhammad al-Adnani ("Adnani") recorded a statement calling for attacks against civilians and military servicemembers of the countries participating in the U.S.-led coalition against ISIS.  Adnani specifically called for suicide bombings, shooting, and vehicle attacks. (*Id.* ¶ 11).

ISIS members and associates make and have made public statements and issued public declarations, which, among other things, (a) proclaimed and acknowledged that acts of violence had been committed by ISIS; (b) threatened future acts of violence if ISIS's demands were not met; and (c) were intended to promote and foster the prestige and standing of ISIS.  ISIS has claimed responsibility for the following terrorist attacks, among others: (1) November 2015 shootings and bombings in Paris, France, killing approximately 130 people; (2) December 2015 shootings and bombings in San Bernardino, California, killing approximately 14 people; (3) March 2016 bombing in Brussels, Belgium, killing approximately 30 people; (4) June 2016 shootings in

5

Orlando, Florida, killing approximately 49 people; (5) a July 2016 truck attack in Nice, France, killing approximately 86 people and injuring approximately 458 others; (6) a December 2016 truck attack in Berlin, Germany, killing approximately 11 people and injuring approximately 56 others; (7) a May 2017 bombing in Manchester, England, killing approximately 23 people and injuring approximately 139 more; (8) a June 2017 truck attack in London, England, killing approximately eight people and injuring approximately 48 others; (9) an August 2017 attack in Barcelona and Cambris, Spain, killing approximately 31 people and injuring approximately 136 others; (10) an October 2017 truck attack in New York, New York, killing approximately 8 people and critically injuring many others, including a 14-year-old child.  (*Id.* ¶ 12).

ISIS spreads its message through social media, Internet platforms, and email.  ISIS uses those platforms to disseminate recruiting materials and propaganda, which include photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by members of ISIS and other Islamic extremist organizations. (*Id.* ¶ 13).

Among other Internet and social media platforms, ISIS has popularized the use of end-to-end encrypted communication services and applications as a means of recruiting, communicating with, and disseminating terrorist training materials and propaganda to its members and supporters. ISIS members and supporters use various applications to communicate.  (*Id.* ¶ 14).

## II.   Bridges Expresses Support for Jihad

Bridges joined the Army in September 2019.  (*Id.* ¶ 15).He later told an FBI online covert employee ("OCE") posing as a female ISIS supporter that he did so in order to mask his support for ISIS and Hamas, another FTO[1].  Bridges wrote to her:

> I used to have connections with people in Hamas and Isis, and my family found out and the government could have arrested me. So I needed to prove to them I wasnt what they thought I was, and I needed the government to get off my back. I dont tell people Im in the military, and I hate displaying the US flag on my shoulder.

Bridges evidenced increasingly troubling conduct in the months before he met the OCE online.  In his first year in the Army, Bridges looked up violent footage on the internet.  In December 2019 he searched for "us soldier shooting," "ak 47 shooting," "ak 47 downsight," and "badass jihadi."  In March 2020, Bridges searched for and watched videos on YouTube entitled, "U.S. SOLDIER COMBAT FOOTAGE, WOUNDED BY TALIBAN SNIPER **GRAPHIC CONTENT 18+**" and "Truck Hit by RPG."  In April 2020, he searched for "muslim warrior quotes."  In August 2020, he searched for "Suicide in Islam" and "Green Beret Ambush."  (*Id.* ¶ 16).

---

[1] "Harakat al-Muqawamah al-Islamiyya," commonly known as Hamas, was founded in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood.  From its inception, Hamas's stated purpose has been to create an Islamic Palestinian state in place of Israel by eliminating the State of Israel through violent holy war, or jihad.  Hamas has not only directed its violence and terrorism against Israeli targets in furtherance of that goal; Hamas's leaders have also assailed the United States and American citizens, in retaliation for and in an effort to weaken American support for Israel's right to exist and defense of that right.  Hamas has murdered and injured dozens of Americans as part of its campaign of violence and terror, and since 1997, Hamas has been designated as a foreign terrorist organization by the United States Government.

And, in the months before he engaged with the OCE, Bridges published repeated and troubling Facebook posts in support of ISIS.  On or about August 2, 2020, he posted a video titled "Changing Minds – The ghuraba – The strangers among Muslims."  The title image of the video included a white flag against a black background with Arabic writing and the title "Tawheed Movement." "Tawheed" (or, "Tawhid") encapsulates the concept of monotheism within Islam and is frequently invoked by members and associates of ISIS.[2]  Additionally, the flag appears to be an inversion of a black flag with white Arabic text, also known as "al-raya," which has been widely adopted by jihadists, including by ISIS.   (*Id.* ¶ 17).

"Al-raya" and the "Tawheed" theme appear also in Facebook comments Bridges posted on August 17, 2020.  In one, he wrote, "One major thing that holds back the ummah from uniting as one under the banner of tawheed is nationalism."  Minutes later he posted a second comment, in which a quote attributed to the Prophet Muhammad is superimposed on a photo of a horseman carrying a version of "al-raya" with a rifle slung on his shoulder.  The quote says, "(Armies carrying) black flags will come from Khorasan.  No power will be able to stop them and they will finally reach Jerusalem where they will erect their flags." (*Id.* ¶ 18).

The same day, Bridges posted a statement that he attributed to Shayk Sulayman Ibn Nasir Al-Alwan, a prominent Salafist scholar and proponent of militant jihad, including jihad in Syria and for the Taliban and al Qaeda.  It said: "Today in Egypt, Shaam [the Levant] and other Muslim countries we can see a war between Islam and Kufr, between Shar'iah and secularism, so there is

---

[2] ISIS militants often display a single raised index finger as a symbol of ISIS and its goal of a single worldwide caliphate

no place to stop, so everyone has to see which side he is on because a man will be [resurrected] with those he loves." Al-Alwan has been imprisoned in Saudi Arabia almost continuously since in or about 2004 and has been convicted of, among other things, financing former al Qaeda leader Abu Musab al-Zarqawi. Al-Alwan taught Abdulaziz al-Omari, one of five hijackers on American Airlines Flight 11 who perpetrated the September 11, 2001 terrorist attacks in the United States. (*Id.* ¶ 19).

Bridges had also used as his profile photograph for an encrypted messaging application ("Messaging Application-1") an image of a seated individual wearing camouflage pants and combat boots, with what appears to be an M4 rifle, which is widely used in the U.S. Army. Translated roughly into English, the Arabic text on the photo reads, "Oh Allah, I ask for martyrdom for your sake. … Ameen, oh God of the world." Within the text are two small images, or emojis, which are (1) a hand with the index finger pointed upward and (2) a black flag, both of which are symbols used by ISIS. (*Id.* ¶ 20).

### III. Bridges Agrees to Provide Advice and Training to ISIS Fighters

Over several months, Bridges told people he believed were ISIS affiliates that he was inspired by ISIS fighters, that he would betray his Army unit if it engaged in combat against ISIS fighters, and that he could provide ISIS fighters tactical advice. (*Id.* ¶ 21).

Bridges started communicating with the OCE, who was posing as a female ISIS supporter, in late-September 2020. In communications with the OCE, Bridges continued down the road he had begun traveling in his online communications, as he expressed his support for ISIS and his willingness to teach combat skills and provide advice to ISIS members. (*Id.* ¶ 21).

On or about October 8, 2020, the OCE asked Bridges how he managed to join the military given his contacts with ISIS. Bridges responded, "Mm nobody knew I had contacts besides my family but it was never confirmed. They were suspicious. Even still because I had homeland security show up to my work before the army. And today this Investigation department came to the camp." Bridges—who had the flag, described further below, in his barracks—then noted, "I mean I have my flag, Ar rayat," and sent this photograph:[3] (*Id.* ¶ 22).



Later in that same conversation on or about October 8, 2020, the OCE asked Bridges how his family had discovered his support of jihadist causes. (*Id.* ¶ 22). Bridges replied, "I had a page online for posting videos and photos." Bridges then wrote "For example" and posted several images, including the images depicted below:

---

[3] The banner depicting white Arabic text on a black background is used by jihadists, including ISIS and its members.





The images and text above include ISIS propaganda and material supportive of ISIS and its cause. For example, some of the above images are excerpts from images previously published in "Al-Naba," an official weekly publication produced by ISIS. (*Id.* ¶ 23).

11

Later that same day, October 8, 2020, Bridges expressed admiration for ISIS militants: "The brothers who have been fighting to establish a khilafah have inspired me a lot, they're [sic] love for Allah and courage to go against all of this world to raise His word to the highest."[4]  (*Id.* ¶ 25).

On October 10, 2020, the OCE asked what Bridges would do if Bridges and his unit were confronted in combat by one or more ISIS fighters.  Bridges replied, in part, "I would probably go with the brothers," which appears to be a reference to the ISIS fighters.  Later, he told the OCE that he supported attacks on U.S. military bases "in Muslim lands."  (*Id.* ¶ 26).

On October 17, 2020, Bridges boasted to the OCE that he was trained for combat and has "skills not everyone else has."  When the OCE asked whether he would share them with "[t]he brothers" in ISIS, Bridges replied, "I can teach them ways of fighting, combat techniques, movements, formations, etc."  The OCE told Bridges that her brother was a U.S. military veteran living in New York City and that he wanted to train for an ISIS operation.  She asked if Bridges could send any training videos.  Bridges replied, "Personally no, not of myself training.  But I have some videos online."  Bridges then asked, "What kind of operation? If your brother is in the US, he needs to be careful."  The OCE suggested they could speak using Messaging Application-1, and Bridges replied, "I have no problem with that. … We have civilian investigators that came by last week taking random people for 'interviews', luckily I wasnt picked. Just message me on [Messaging Application-1]."  (*Id.* ¶ 27).

---

[4] Khilafah refers to the concept of a global caliphate, or unified leadership for Muslims worldwide, which for *Salafist* jihadists includes strict shariah law.  Establishing this state is an ISIS core objective.

Later that day, Bridges sent the OCE the following message on Messaging Application-1:

> But if your brother and the other brothers are planning an operation, depending on if it is an attack or something against the kuffar. They need to be extremely careful and not to discuss plans over the phone or through messages. Sadly I can't participate. But the only involvement I can do is advice and training techniques ... your brother can feel free to contact me anytime.

Bridges described some of what he could offer ISIS: "Just advice on combat and different tactics. [Your brother] is an American and has been in the army so I have no doubt he knows how the government works." Bridges then sent a clip of a combat training video, and wrote:

> I work in a small 4 man team and we train like this exactly. In this video these guys are doing the basic but there are many ways when it comes to reacting to contact and eliminating the enemy. These guys in the beginning call out contact and quickly get down and try to gain fire superiority, as one covers the other one moves closer to the target and then calls the other guy down. You have to shoot, move, and communicate when pushing on your objective.

In a conversation with the OCE on October 18, 2020, Bridges wrote on Messaging Application-1 that ISIS fighters needed better training: "ISIS in my opinion had their intentions of a khilafah but they broke many rules which led to their downfall. In my opinion if there was to be a reestablished Islamic State, then they shouldn't repeat the same mistakes as before and actually fight like real men. A reformed version of ISIS[.] Isis had many foreign fighters from Europe and the US. And was organized but had room for improvement. If the fighters had the proper training, uniforms, and weapons, then yes the soldiers of the khilafah would be unstoppable." (*Id.* ¶ 28).

The OCE, posing as her purported brother, "Daoud," contacted Bridges on October 20, 2020. Over the following weeks, Bridges and "Daoud" exchanged communications on two encrypted applications, Messaging Application-1 and Messaging Application-2. They discussed

13

their shared support for ISIS and ways by which Bridges could, through Daoud, help ISIS fighters in Syria.  (*Id.* ¶ 29).

Bridges highlighted that his Army experience could aid ISIS.  On October 22, 2020, Bridges told "Daoud" that "[e]ven though I do not like being in the US Army, because my beliefs dont match their cause. The things I have learned would be useful for the ummah."  He then listed: "Tactics, Reconnaissance, Security."  The OCE asked Bridges, "How would you best be able to do this akhi? If you could help the Ummah with these skills, how would you?"  Bridges responded "Well, videos possibly, writing a type of manual," and then wrote, "Someday inshallah ta'ala actually being able to physically teach brothers of the ummah that want to fight."  (*Id.* ¶ 30).

Bridges eventually delivered on his pledge to send videos and parts of a training manual. Asked by "Daoud" if he realized that the tactics he shared could be used against "those you serve with," Bridges replied, "Yes I understand that, the establishment of a Khilafah is more important and raising Allah's word above all and His sharia. Few of the few will fight for His cause. As those before us fought, some of the people I serve with might choose to join."  (*Id.* ¶ 31).

Meanwhile, Bridges continued researching jihadist propaganda videos.  From October 21 to November 2, 2020, he searched and viewed the results for the following search terms: "Isis nasheed," "Ummat al Islam BushraAbu Malik," "Isis ideology," "Faking on joining the army," "Abu Ali- Say to the Aggressor (Nasheed)," and "Captured U.S. Soldier on Tape."  The Youtube videos "Ummat al Islam BushraAbu Malik" and "Abu Ali- Say to the Aggressor (Nasheed)" appear to be jihadist propaganda videos.  The YouTube video "Captured U.S. Soldier on Tape" relates to Bowe Bergdahl, a former U.S. Army soldier who was convicted in a court-martial

proceeding for deserting his unit while stationed in Afghanistan.  He also searched and viewed, "I Was A Teenage Terrorist VICE News."  (*Id.* ¶ 32).

The OCE, continuing to pose as "Daoud," sent Bridges the following message on Messaging Application-1 on October 26, 2020:  "As I told you before, there is a group of brothers I work with. They are in need of training, as well as someone who is knowledgeable in reconnaissance. We work together on [Messaging Application-2] while observing operational security practices."  The OCE created a group chat on Messaging Application-2 that included the OCE, Bridges, and an account used by an FBI confidential source (the "CS") posing as a France-based ISIS supporter.  Bridges continued communicating one-on-one with "Daoud" while also participating in the group chat.  (*Id.* ¶ 33).

"Daoud" offered to introduce Bridges to other affiliates in France, writing on October 28, 2020, "we have brothers in both Paris and the U.S. … we believe that the US and the French are inextricably linked … one supports the other and they both have a common enemy: us."  Bridges responded, "Well yes of course, the US is the main one in the world that has a grip on the muslim world and main establisher of democracy."  After the OCE said that there had been multiple ISIS attacks in France in which the attackers had died needlessly, Bridges replied, "I agree, because a knife attack isnt going to do damage. The targets are those that are in power, not civilians The targets are those that enforce the power by the kuffar government.  Enforce the rules."  The OCE then asked Bridges, "what do you think is the most effective way to conduct an attack."  Bridges responded, "Striking the heart of the enemy, and setting a statement and a clear message to the leaders."  Asked whether he could envision himself joining an insurgency in the United States, Bridges replied that he was "questioning" whether he should have joined the Army.  It made him

15

feel "like a bit of a traitor," though he was "realizing what I learn here can benefit the ummah. Probably someday acting upon." (*Id.* ¶ 34).

Bridges and an individual who was, unbeknownst to Bridges, an FBI confidential source (the "CS") posing as a person in direct communication with ISIS members who were actively plotting terrorist attacks started a private chat on October 29, 2020. On November 6, 2020, Bridges urged the CS to prepare meticulously before executing any operation. "[I]f you have thoughts that it will not succeed then it is best to take a step back and to better your plans and training[.] And look over your plan[.] Every small detail counts." Bridges continued: "[s]tudy the area[.] Anything and everything[.] Every alley, every building[.] Streets[.] Engagement criteria[.] Disengagement criteria[.] And study your enemy[.] Their forces[.] Literally akhi, paint the Battlefield every detail can mean defeat or victory." Bridges then suggested that the CS use satellite imagery to map out the battlefield. (*Id.* ¶ 35).

Bridges also wanted to ensure that his advice reach fighters in ISIS territory. The CS asked Bridges, "Is your knowledge something that you have thought about sharing with the khilafah?" Bridges answered, "I can share it with the khilafah, as well I have much to learn, the learning never stops, that is why Im trying to go to different training schools in this army, I want to try to go to sniper school." The CS praised that idea, and asked Bridges if he would share his military training with ISIS members, or even join them for in-person trainings. Bridges swiftly agreed, telling the CS, "I could akhi pass the knowledge on[.] Yes it would be very risky." (*Id.* ¶ 36).

On or about November 12–13, 2020, Bridges sent U.S. military tactical training resources to the CS. Bridges wrote, "I have a book that I could send photos" and "a lot of it is working with who you will be fighting along side with. So you can build that repetition and muscle memory."

16

After the CS asked Bridges to send the material, Bridges sent several photographs of pages from what appears to be a U.S. Army field manual (the "Field Manual").  The images of the Field Manual contained, among other things, steps for troop maneuvers and military operational details. After sending the images, Bridges began to advise the CS about operational details.  For example, Bridges wrote:

> Another scenario, if brothers are in contact with enemy combatants and it is a overwhelming force you need to "break contact," dont just simply get up and run away.  You have to keep firing at the enemy and keep suppressing and bounding back gradually depending on how many are on your squad.

Bridges then sent diagrams on combat tactics and continued to provide advice, including about how ISIS fighters could use a "bottleneck" tactic to create a "kill zone."  Bridges explained:

> [T]here is multiple ways to do this, Ill have to draw one out of that my squad uses called a "bottleneck" where we basically can form a kill zone and move the enemy to where we want them.  Because, bullets move people, so when done right you can move them to where you want them.

The following day, Bridges sent the CS instructions for developing good marksmanship, including a passage on "Marksmanship Fundamentals … used when firing in the rapid semiautomatic mode."  He advised, "Sight picture is important as well," continuing, "When aiming, focus on your target and not the actual sight post[.] And make sure to hold the rifle correctly and tightly so you can control it with the recoil[.] Keep both eyes open[.] Aim for the center of the body."  (*Id.* ¶ 38).

On or about November 13, 2020, the OCE, as "Daoud," noted the value of the training, and told Bridges: "[W]e've sworn bay'at to Dawlah [ISIS], we want to ensure to progess the Caliphate."  Bridges then discussed with the OCE and CS details of a potential ISIS attack on U.S.

military personnel.  Knowing the OCE and CS were closely involved in attack planning for ISIS, Bridges took on the role of an advisor, providing guidance for what he believed would be an attack on U.S. military personnel.  Bridges asked, "how many brothers would be participating in the attack?"  The OCE replied, "there will be two attacks," and then asked the CS, "how many in yours?"  Bridges responded by asking "any weapons?  Ammo count.  Body armor."  The OCE replied, "I have 4 brothers and yes to weapons."  Bridges then asked "two?"  The CS then stated, "4 or 5.  We are still working on the logistics.  We still cannot agree on some stuff.  But I think with the materials you gave us, we can work things out."  The OCE added, "4 AR-15s, 4 handguns, a shotgun, and a Remington 700 SPS Tactical.  I am still trying to recruit someone with sniping skills."  Bridges then asked the CS, "how about you," to which the CS replied, "I think we have enough recruits for now.  They all have different skills but need to work on improving them for sure.  That's why I asked for your help."  Bridges then said:

> What weapons do you have?  Trying to put logistics together because depending on the ammo count youll have to distribute it evenly.  Because if you want these attacks to succeed, you'll have to plan every last bit of detail and have multiple back up plans and avoid all costs of being captured.

Later in the exchange, Bridges advised the CS and the OCE to destroy their cellphones once the purported attacks commenced, and Bridges offered to come to New York to visit the OCE sometime after Bridges returned to the United States.  (*Id.* ¶ 43).  The OCE suggested Bridges could train the attackers in person.  The OCE wrote, "It would be an honor to have you there to train us if that was something you would want."  Bridges replied, "I would be honored to akhi."

18

The CS also asked, "do you want us to relay a message for you," referring to relaying a message from Bridges to ISIS, and Bridges responded, "may Allah [Glory be to Him, exalted is He] help us establish a Khilafah, and grant us victory against the kuffar, [God willing]."

As Bridges carried on that conversation, he was simultaneously advising the OCE in a private chat about attacking targets in New York in support of ISIS in which Bridges advised the OCE on particular targets, the amount of ammunition required, and discussed which targets may be appropriate for a "sniper kill." For example, on or about November 13, 2020, the OCE sent a message to Bridges, stating "I tried to work a little of your cav[alry] scout magic." The OCE, who was in New York, then sent Bridges a series of photographs of federal, local, and foreign government buildings in and around New York City. In connection with these messages, the OCE also wrote, "Everything is so heavily guarded, I don't know that it's even possible to do an operation in NYC," to which Bridges chillingly responded "choose your targets wisely," and asked the OCE if the OCE would be able to participate in a call with Bridges. The OCE agreed to have the call later and then stated, "I also went a few other places I will send you those too." After Bridges asked which other places, the OCE identified other government buildings in New York City. In response, Bridges commented "not enough firepower for that." The OCE and Bridges further discussed a potential attack at the 9/11 Memorial. Bridges initially stated that he believed that the 9/11 attacks were murder. The OCE replied, "Yes I was thinking of when the diplomats came though, the heads of state." Bridges then wrote they could be "a key target." He said, "that could honestly be a sniper kill and then getting out quietly for a second attack." The sniper, he said, could target "[a]ny person that participates in the gov[ernment]." (*Id.* ¶ 45).

On or about November 17, 2020, the OCE sent Bridges a screenshot of a purported message exchange between the OCE and the "brother in Dawlah," i.e., Syria in which the OCE shared with the ISIS "brother" a screenshot from the Field Manual that Bridges had sent to the CS.  It also showed that the OCE had relayed to the purported ISIS comrade some of the combat tactical advice that Bridges had previously provided to the CS, stating that "he [i.e., Bridges] said that if you and the brothers are fighting and it is against too strong of a force and you need to retreat you have to 'break contact,' which means you don't get up and run away, but keep firing at the enemy and suppressing and bounding back gradually."  The OCE further stated, "he [i.e., Bridges] also mentioned a thing that his squad uses called a 'bottleneck' where they form a kill zone and move the enemy to where they want them.  He said that because bullets move people, so if done right the brothers could move them to where they want them."  The "brother" responded "what this means bottleneck??"  Bridges then stated to the OCE "Mashallah Ill draw out a bottleneck haha." The OCE then asked that Bridges get a new cellphone to communicate with the OCE once Bridges returned to the United States, which Bridges agreed to do.  Bridges also stated that he was going to discard the phone that he had been using.  When the OCE asked whether this was to "get[] rid of the evidence," Bridges replied, "Mm yes."  (*Id.*).

On or about November 28, 2020, Bridges traveled from Germany to the United States as part of his unit's scheduled return from its overseas deployment.  (*Id.* ¶ 46).

### IV.  Bridges Provides Tactical Instructions for How to Defeat a U.S. Military Operation and Kill U.S. Soldiers in Support of ISIS

After Bridges returned to the United States, he continued communicating with the OCE's "Daoud" persona and evidencing his deep desire to support ISIS. (*Id.* ¶ 47).

20

On or about December 26, 2020, Bridges contacted the OCE, who stated, "it is good to hear from you. I was getting concerned you had run into some trouble." Bridges responded, "Well now that I [] am back in the states investigators are always around . . . I think you know what I mean like the briefs that you get from a CI and about espionage, etc." (*Id.*).

On or about December 27, 2020, after the OCE stated that Bridges should stay safe and avoid being "compromised," Bridges responded, "No akh, If I were to be comprised I would either become a martyr or somehow escape the country." (*Id.* ¶ 48).

Later in the exchange, after the OCE asked if Bridges was comfortable discussing further plans for an attack, Bridges stated that he believed it would not be appropriate to conduct an attack in the United States—because that would be "offensive jihad"—but that an attack against U.S. troops abroad would be permissible because that was "defensive jihad." (*Id.*).

At another point in the exchange, the OCE stated "Oh yes I almost forgot-the brother from Sham was asking about the bottleneck drawing you described." Bridges agreed to complete the drawing, and explained that the concept was based on a four-man team. (*Id.* ¶ 49). Bridges proceeded to send the following images to the OCE with accompanying explanations describing the "bottleneck" tactical combat procedure that ISIS could use against U.S. soldiers:



Bridges explained that the markings below the blue "Xs" represented different types of soldiers, such as "machine gunners," "grenadiers," "assistant gunners," "team leader," and

21

"rifleman."  Bridges continued to explain the steps in the "bottleneck" combat procedure, sending

additional diagrams, including the following sequence of images:







As Bridges sent the diagrams, he continued to explain the depicted troop movements, including how the ISIS fighters should fire, when they should use grenades, and how to avoid U.S. Army grenades. For example, Bridges stated that the OCE should tell the ISIS fighters to stay a certain distance apart "because if the enemy throws a grenade then it won't kill anyone," and Bridges specified the range of a particular type of U.S. Army grenade so that the ISIS fighters could avoid it. (*Id.* ¶ 51).

Asked if these tactics "would work even against US troops," and told "our Dawlah brothers fight against US Special Forces sometimes," Bridges told the OCE, "Possibly but every squad makes their own tactics in different scenarios[.] There are thousands of ways[.] I guess kill them before they realize it[.] Those guys are hardcore[.] But not impossible to beat." (*Id.* ¶ 52).

The OCE requested permission to "send the drawings and the descriptions you gave to the brother in Dawlah?" Bridges responded:

> Bridges:     Yes
>
> OCE:         Ok. You sent a message last time what do you want me
>              to tell them this time?
>
> Bridges:     Inshallah ta'ala that they are all well, and to continue the
>              fight. Firmness until death, and to keep patient and that
>              they are on the right path. Be eager to fight and ready to
>              fight but have patience. may Allah عزوجل [Mighty and
>              Majestic is He] grant victory to Jundullah [the soldiers
>              of Allah].
>
> OCE:         Alhamdulillah!
>              I will tell them
>              They may have more questions on tactics to support their
>              fight in Sham
>              Is it ok if I forward them to you if they do?
>
> Bridges:     Yes akh

Id be happy to answer

Bridges attempted to deliver on his pledge to aid ISIS fighters in Syria on December 29, 2020. The OCE sent Bridges a message telling him that U.S. forces had killed ISIS "brothers," including the brother "most knowledgeable" about combat tactics. The OCE wrote to Bridges that the ISIS fighters were seeking advice about how to protect a leader, or "Emir," from another ambush of their compound by "American forces," and explained that they were "asking about the bottleneck." (*Id.* ¶ 53). Bridges responded:

> I mean the best they can do is rig the house with explosives And have a group of brothers observe Until the raid starts and then just blow the house up. I mean if they want to have defensive positions they have to be in places where the enemy [i.e., the U.S. soldiers] will never suspect them of being. Because the special forces have these houses observed before a raid and they get as much info about everything.

The OCE replied, "I think they were thinking of trying to set up defensive positions outside and then booby traps and stuf like that but wanted advice on the best way to position their forces They sent me some images (without telling the exact location obviously)." (*Id.* ¶ 54).

The OCE then asked if the OCE could send to Bridges the images purportedly provided to the OCE by the ISIS fighters showing their position, and after Bridges agreed, the OCE sent to Bridges the following satellite image, with the message, "They were asking my advice on the best place to place their weapons." (*Id.*).

24



The OCE continued, "And I told them I am not the man for that lol … They liked your bottleneck drawings so much they asked if you could help them with this too."  Bridges responded, "Lol well can you mark what the house is And I guess the avenue of approach."  The OCE replied, "haha it's the main compound that is walled in."  Bridges then sent the following image back to the OCE with the ISIS compound circled and the message, "so the whole area is walled in?"  (*Id.* ¶ 55).



The OCE responded, "the little houses to the east are their's too, but the Emir is in the main compound," referring to the purported ISIS leader that the fighters were seeking to protect.  The OCE continued, "they have a technical and two light machine guns and two RPGs."  Bridges responded, "I mean they are definitely being observed if they think a raid is coming … they could move the Emir to one of the small houses and of course give hin protection, because the main compound will probably be the focus."  The OCE then asked where Bridges thought the ISIS fighters should place their weapons.  After Bridges asked if there was more than one exit, the OCE asked Bridges, "Would you mind drawing on the image like you did with the other one so I can send it to the brothers for their reference?" and "Like where to put the guns/rpgs." (*Id.* ¶ 56).

Bridges then proceeded to explain how the ISIS fighters should position themselves and their weaponry, including that they should "definitely rig the house with explosives if they can" and "Put a Light machine gun and a RPG on the roof."  (*Id.* ¶ 57).  As he conveyed these tactical instructions, Bridges also provided marked-up versions of the satellite image of the purported ISIS

26

compound diagramming his combat advice, including the following image in which Bridges identified an exit from the compound with an "x":



After he was told that the ISIS fighters thought the U.S. soldiers would arrive by helicopter, Bridges advised that the fighters should "[d]efinitely get a lmg and a rpg on the roof," and "make those little building to the east as their last stand if needed, and can pick a building as their 'Alamo' that they must hold until the last man, whichever building they choose should be the same one Emir is in." (*Id.* ¶ 58). Bridges drew out the scenario, sending the following marked-up image to the OCE:



Later in the exchange, the OCE asked Bridges to clarify what Bridges meant by "Alamo," stating "Apologies akhi, I'm going back and forth between you and the brothers in Dawlah." Bridges then sent the following image, clarifying for the ISIS fighters the "Last Stand Area":



The OCE also asked Bridges if he would still consider this to be "defensive jihad," an approach, as described above, that Bridges stated he supported , and Bridges responded "in my eyes, yes." The OCE then wrote, "I was just asking because you mentioned rigging the house to explode Which would almost definitely kill all the Special Forces … Your expert advice will help our brothers kill the kuffar when they come to attack and allow them to continue on their mission." Bridges responded, "Yes well of course get all the men out of the house and then blow the house." Bridges was advising that the ISIS fighters should rig their compound with explosives, and when the U.S. soldiers entered the compound, the ISIS fighters should all leave the compound and then blow it up while the U.S. soldiers were inside. (*Id.* ¶ 60).

Later that day, Bridges asked the OCE if the "brothers" in Syria "like[d] the info I gave?"

On January 6, 2021, Bridges sent the OCE a video that depicts Bridges with part of his face covered in a tactical mask, wearing body armor, and making the index-finger gesture symbolic of

support for ISIS.  (*Id.* ¶ 62).  In the video, Bridges is standing in front of what appears to be his black and white "al-raya" flag, while recorded chanting can be heard in the background.  A screenshot from the video appears below:



Between January 6 and January 12, 2021, Bridges and the OCE exchanged messages about Bridges participating in an ISIS propaganda video that would highlight the attack against U.S. Special Forces that Bridges was seeking to facilitate.  (*Id.* ¶ 64).  The OCE said, "The idea will be

that they get footage of the ambush of the special forces." (*Id.* ¶ 64). Bridge responded, "Alright that will be good." Bridges and the OCE then discussed the script for the video. The OCE provided Bridges with text to read, which a "brother" in Syria purportedly drafted.

On or about January 12, 2021, Bridges sent the OCE a video in which Bridges appears to be wearing body armor and again standing in front of what appears to be a flag used by ISIS. During the video, Bridges, speaking through a voice changer, promoted the purported ISIS attack on U.S. soldiers, adding his statements to those provided by the OCE. In a post-arrest interview, Bridges said he believed the "brother in sham [Syria]" wrote the script. A screenshot from the video showing Bridges appears below:



Bridges recorded the video in his barracks while his roommate was asleep. In the video,

Bridges said:

> Once more the cowardly Americans sought to violently destroy us, striking in the dead of night. In their arrogance, they have been slaughtered like the sheep they are. The Mujahideen live to fight for another of their days. What is the cost to your nation, oh you people of America? How many sons, how many brothers have been lost in the desperate attempt to prevent those who claim jihad from establishing a Khilafah? The remedy is simple. You soldiers of lies, murderers of innocent women and children, repent and lay down your weapons. Open your eyes to the truth and pick up the banner of *tawhid*, the banner of the Islamic State, the banner of the Khilafah. Do not accept injustice and restore your honor. Believe in Allah subhanahu wa ta'ala and pledge your loyalty to the Khilafah.

> Wars have many ways of being fought. They have many ways, not just in combat and bullets and fighting. Wars are won in many ways and fought in many ways.

> I am a lion of jihad. I have seen the failures of this country and her allies. I have seen the terrible things that have been done to the people in my ummah in the name of "justice" and "democracy." Battles are fought daily in the deserts of Sham, al-Quds, and on the plains of Africa. Via the channels of Telegram and in the groups of Facebook. I urge you, O brothers and sisters of America, in the west – I urge you: do whatever is in your power to help establish the Khilafah.

> Have you not been commanded? Allahu subhanahu wa ta'ala says in the Quran, "O you who believe! Fight the kuffar who are close to you, and let them find harshness in you." Surah At-Tawbah, ayah [verse] 123. As long as the lions of this ummah continue to fight, inshallah ta'ala, we will fight. The Islamic State will remain.

> You can kill us, you can torture us. You can raid our homes. But you cannot kill an ideology. You can't.

> In conclusion, we command the soldiers of America and her allies to cease their unjust actions and to hinder their officers that

> fail to walk to the straight path of al-haqq.  How many more innocent
> people in the ummah have to die.  How many mothers need to lose
> their sons?  How many children need to lose their fathers?  O Allah,
> forgive us our sins and plant our feet firmly as we continue to fight
> for the *khilafah* in the name of Allah subhanahu wa ta'ala.

(*Id.* ¶ 65).  At various points during the recording, Bridges raised his index finger—as noted above, symbolizing "tawheed" and used as a symbol of ISIS.  He stated in his post-arrest interview that he used a voice-changer and wore a mask to conceal his identity because he knew he could get in trouble if his identity were discovered.  (*Id.* ¶ 66).

After the OCE praised the video, responding, "You sound like a true Islamic State spokesperson akhi … the brothers are going to use the video after the ambush to inspire the Ummah to rise up and to join the mujahideen.  InshaAllah they will slaughter the Special Forces as they come to get the Emir," Bridges enthusiastically suggested he would create more footage: "Haha my first time[.]  Inshallah ta'ala [God willing, exalted is He]."  Bridges said he would record more such videos if the "brothers" requested. (*Id.* ¶ 67).

Proud of his work, Bridges also sent the video to the CS.  The CS asked if the video would be posted on Telegram.  Bridges said, "I believe so haha."  Bridges then told the CS, "That video I made is being sent to brothers in the sham."  (*Id.* ¶ 68).

Soon after Bridges sent the video recording, the OCE told Bridges that the ISIS fighters in Syria believed a U.S. military assault was imminent.  The OCE said they were hearing helicopters.  Bridges answered, "If the helicopters are black those are good targets[.] The pilots that fly the black helicopters are special forces[.]  I heard that they are sending men from the 160th to Iraq and

Afghanistan."[5]  The OCE asked, "Would an RPG or a machine gun be better to take them down?"
Bridges replied, "100%[.]  If you had stingers it would be easier."  (*Id.* ¶ 68).

Bridges then volunteered to make a "better video."  He sent it to the OCE approximately
four hours later.  The OCE praised him again: "You put a great deal of work into it. Lol they might
hire you as the official English spokesperson of the Islamic State!"  Bridges answered, "Haha
inshallah."  (*Id.* ¶ 70).

### V.  Bridges' Arrest and Post-Arrest Interview

FBI agents arrested Bridges on January 19, 2021, at the Charlie Troop Command Post in
Fort Stewart, Georgia.  That same day, FBI investigators conducted a video-recorded, *Mirandized*
interview in which Bridges admitted that he attempted to supply ISIS with the guidance and
support it needed to carry out a deadly ambush on U.S. troops.  He also admitted that he recorded
an ISIS propaganda video in his barracks while his roommate slept.  Bridges told investigators that
he knew ISIS is considered a Foreign Terrorist Organization, that he "had a feeling" that his actions
would benefit ISIS, and that he expected the ISIS fighters to kill U.S. special forces in the ambush
he helped his contacts prepare.  (*Id.* ¶ 71).

Asked why he thought he was under arrest, Bridges said it was because he was "involved
in stuff that I wasn't supposed to."  When asked to elaborate, he said "I guess terrorism."
Throughout his interview with the investigators, Bridges drew distinctions between ISIS and other
FTOs, including Hamas and Hezbollah.  He also recognized a difference between the Islamic faith

---

[5] Bridges's father is a helicopter pilot in the 160th Special Operations Aviation Regiment
(Airborne).

and the ideology promulgated by ISIS, noting that his support for ISIS was not the reason he converted, and that his support for ISIS developed some time later. (*Id.* ¶ 72).

Bridges told the investigators that he believed he had knowledge that ISIS could use. Bridges speculated that Daoud and the France-based jihadist were talking to him because Bridges's combat training "could be useful." Bridges recounted that Daoud claimed to be a military veteran but he did not have combat training, and "I guess the brothers in Sham [Syria]"—meaning ISIS fighters—"like, need the training." The propaganda video was another kind of support Bridges admitted to giving ISIS. (*Id.* ¶ 73).

Bridges also admitted to helping plan the ambush of American troops by ISIS fighters, knowing his advice could help the fighters killed U.S. special forces, and further acknowledged that the information could have resulted in the deaths of soldiers such as his father who was deploying within a month of Bridges' arrest. When asked how he would feel if his father was killed as a result of the information he shared, Bridges responded, "I don't know how I would feel." Bridges also acknowledged that he considered that fact when engaging in conversations regarding the planned assault, but ultimately that it did not impact his decision to share the information, agreeing with the interviewing agent that "if it happens, it happens." (*Id.* ¶ 74).

## PROCEDURAL HISTORY

On February 3, 2021, a grand jury sitting in this District indicted Bridges in two counts: (1) attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B; and (2) attempting to murder U.S. military servicemembers, in violation of 18 U.S.C. § 1114. (PSR ¶ 1).

On June 14, 2023, Bridges pled guilty, without entering a plea agreement, to the two counts in the Indictment. (PSR ¶ 5). As a result of Bridges's guilty plea, he faces a combined maximum sentence of 40 years' imprisonment. (PSR ¶¶ 12, 122-123).

## THE GUIDELINES RECOMMEND A 40-YEAR SENTENCE

The applicable Guidelines in this case are undisputed.[6] The PSR reflects that the pre-adjustment offense level for both Counts One and Two is 50. (PSR ¶ 5). However, because the maximum offense level authorized by the Guidelines is 43, the combined offense level is 43. (*Id.*). Because the offenses charged in Counts One and Two are felonies that involved, or were intended to promote, a federal crime of terrorism, the defendant's Criminal History Category is VI. The Guidelines range of imprisonment would therefore be life imprisonment. (*Id.*). However, because that range exceeds the statutorily authorized maximum sentence, the Guidelines term of imprisonment is the statutory maximum of 40 years. (*Id.*).

The Probation Office recognizes the "compelling need for a lengthy term of imprisonment to reflect the seriousness of the offense and the utmost need for general deterrence cannot be overstated." (PSR at 47). As the Probation Office noted:

> Bridges, as an active-duty member of the U.S. Army, knowingly and willfully violated his oath of enlistment and sought to provide material support to ISIS, a group deemed to be a terrorist organization by the U.S. The defendant's offense conduct was particularly egregious as he discussed military battlefield tactics that sought to cause serious bodily injury and death to his fellow U.S. servicemembers with individuals whom he believed were sufficiently capable of causing such harm. Bridges also suggested civilian targets in New York City with those same individuals and with a similar purpose of causing serious bodily injury, death, and destruction.

---

[6] In its submission, the defense does not dispute the Guidelines calculation in the PSR and the defense lodged no objections with the Probation Office to the Guidelines calculation.

*Id.* The Probation Office nonetheless recommends a variance to 20 years' imprisonment to provide "some sense of hope for a young man whose decisions made in his youth will not subject him to punishment for most of his adult life." (*Id.*). The defendant seeks an even more drastic variance to a sentence of less than 4 years. (*See* Def. Ltr. at 4). The Probation Office's recommendation and the defense's request wholly fail to account for the gravity of the defendant's crimes, the threat that he poses, the need to protect the public and deter such heinous conduct, and the other sentencing factors discussed at greater length below, which collectively militate conclusively in favor of imposing the only appropriate sentence in this case: the Guidelines sentence of 40 years in prison.

## **APPLICABLE LAW**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6)

"the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## **ARGUMENT**

### **I.    The Section 3553(a) Factors Compel a 40-Year Sentence**

#### **A.    The Nature and Circumstances of the Defendant's Crimes**

The defendant's treasonous, murderous conduct — an active-duty U.S. soldier attempting the unthinkable act of murdering his fellow servicemembers in support of a terrorist organization — marks a stunning betrayals from within the ranks of the U.S. military.  The nature and circumstances of the defendant's crimes are shocking and abhorrent.  *See* 18 U.S.C. § 3553(a)(1).

The defendant sought to murder his fellow servicemembers in a devastating ambush. Daily, the defendant lived and trained alongside soldiers just like the servicemembers he sought to have murdered, having sworn an oath of loyalty to this country and tasked with the mission of protecting the United States.  But, instead, the defendant was secretly plotting a very different

mission: to kill servicemembers he was sworn to protect and serve alongside. Steeped in jihadist ideology, the defendant jumped at the opportunity to help ISIS murder Americans, providing tactical advice, videos, and diagrams to maximize the lethality of such an assault. In seeking to have his fellow soldiers maimed and murdered, the defendant turned his back on his country while seeking to align himself with and empowering our nation's sworn enemies. The defendant subordinated his oath of loyalty to the U.S. Army to his loyalty to ISIS, a group bent on America's destruction, proudly declaring himself a "lion of jihad" and flaunting his betrayal proudly in a propaganda video wearing Army Kevlar and flanked by an ISIS flag. While any terrorism offense is inherently serious, consideration of the defendant's background, the context in which he committed his offenses, and the specific details of those offenses underscore the exceptionally grave and terrifying nature of his crimes and necessitate a Guidelines sentence reflecting the statutory maximum.

The defendant's betrayal of his country and his comrades was no momentary lapse in judgment; he had been building up to this treasonous conduct for years. Indeed, despite the defense's insinuations to the contrary, the defendant's horrifying conduct began months before he even met the OCE. As described above, Bridges acknowledged that he *joined* the military in the first place in order to mask his support for ISIS and Hamas, another FTO. (PSR ¶ 15) ("I used to have connections with people in Hamas and Isis, and my family found out and the government could have arrested me. So I needed to prove to them I wasnt what they thought I was, and I needed the government to get off my back. I dont tell people Im in the military, and I hate displaying the US flag on my shoulder."). It bears emphasizing this appalling fact: the defendant, as a follower of a jihadist group bent on America's destruction, methodically and cunningly infiltrated this

country's armed forces, lying at every turn about his true affiliations and loyalties. The defendant's actions were calculated, committed over great lengths of time, and wholly premeditated. And all of these actions came *before* the defendant began communicating with the OCE.

After successfully infiltrating the military, declaring his support for jihad, and escalating in his radical ideology, Bridges started communicating with the OCE in late-September 2020 and took advantage of what he believed was an opportunity to take action in support of ISIS. Bridges sprang into action, eager to teach combat skills and provide advice to ISIS members. During this period, Bridges accelerated his downloading and consumption of graphic jihadist videos, including videos labeled "Isis nasheed," "Ummat al Islam BushraAbu Malik," "Isis ideology," "Faking on joining the army," "Abu Ali- Say to the Aggressor (Nasheed)," and "Captured U.S. Soldier on Tape." From the privacy of his own internet connection, the defendant had evolved into a hardened ISIS supporter eagerly willing to support jihadist forces in furtherance of their shared goals: killing as many U.S. soldiers as possible.

The defendant's decision to help facilitate an attack on U.S. servicemembers was the culmination of his lengthy commitment to ISIS and its violent ideology. He shared a constant stream of actionable information to people he believed to be ISIS members with one goal in mind: maximizing carnage for his fellow soldiers. He was ready, willing, able—and, indeed, eager—to perpetrate violence on behalf of ISIS by betraying the U.S. Army. He disclosed maneuvers, tactics, and training meant to maximize the death of American soldiers in a discrete attack—soldiers just like the defendant and his platoonmates—all while noting his willingness to "become a martyr." (PSR ¶¶ 20, 48). The gravity of Bridges' conduct is further demonstrated by the fact that Bridges shared specific training and tactical information with the purported ISIS members. Bridges was

40

fully aware of the sensitivity of this information, warning that they "need to be extremely careful and not to discuss plans over the phone or through messages" and instructing him to destroy cellphones once the purported attacks commenced.  (PSR ¶¶ 27, 43).  And, as detailed above, Bridges gladly took a victory lap, filming a jihadist video promoting what he believed had been an ISIS attack on U.S. soldiers while wearing his U.S. Army body armor and standing in front of a jihadi flag.  Notably, during the video, Bridges added his own statements and flourishes to the statements provided by the OCE.

The seriousness of the conduct is also reflected in Bridges' complete dedication to a successful ambush—to maximizing bloodshed.  As Bridges stated, the entire purpose of the "bottleneck" tactic was to create a "kill zone" and "move the enemy to where we want them." Bridges was instructing a purported ISIS member on how to move his fellow soldiers into a "kill zone" a day before he sent the CS instructions on how to improve his marksmanship "when firing in the rapid semiautomatic mode."  (PSR ¶¶ 38-39).   Similarly, Bridges's instructions to "rig the house with explosives" and about where to place the ISIS fighters during the ambush were to further his deadly aims.  (PSR ¶ 53).  And while he now seeks to minimize his conduct in nearly every way, he squarely admitted under oath at his guilty plea proceeding that he in fact attempted to murder his fellow soldiers.  Simply put, Bridges's goals were clear and monstrous — he sought to murder his fellow soldiers — and a Guidelines sentence is appropriate to account for this conduct.

In his submission, Bridges tries hard to minimize his conduct, claiming several times that this was a "sting" by the FBI.  (Def. Ltr. at 11, 12, 14).  What the investigation revealed, however, was that after displaying support for ISIS for many months despite his status in the military,

Bridges engaged in discussions with the OCE and CS, fully believing that he was planning the murder of U.S. Army servicemembers. He did not meet that objective, but that was not because he thought better of his murderous goals — to the contrary, he was chillingly and relentlessly committed to supporting ISIS in its mission by killing U.S. soldiers. Had the attack played out as Bridges planned and hoped, the lives of numerous soldiers would have been lost, families devastated, and the U.S. military — and this country — seriously shaken and harmed. *See United States v. Stewart*, 590 F.3d 93, 175 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) ("[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." (internal quotation marks omitted)). "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm does not mitigate such a crime." *Id.* As in *Stewart*, the absence of more concrete injuries "is in no sense attributable" to the defendant. *Id.* He targeted the United States and its Armed Forces despite the fact that he had sworn an oath to support and defend this country. The impact on Bridges's platoonmates is also very real and lasting, as they all must live with the enduring knowledge that their fellow soldier betrayed and plotted to murder U.S. soldiers in cold blood. The Government anticipates that two members Bridges' unit will provide impact statements in connection with sentencing, further describing some of the lasting impact Bridges' crimes have had on them, the unit, and the military.

Bridges' offenses were abhorrent and extremely serious. Deeply committed to a jihadist ideology, he sought to disclose sensitive information to facilitate an attack that would slaughter American soldiers. A Guidelines sentence is necessary to reflect the depravity and seriousness of

a U.S. soldier taking up arms against his country and trying to kill his fellow servicemembers.  The extraordinary seriousness of Bridges's conduct standing alone warrants the Guidelines sentence of 40 years' imprisonment.

### B.  The Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant

A Guidelines sentence is also necessary to adequately deter the defendant's criminal conduct—in this case, terrorism aimed at harming Americans, American interests, and advancing jihadism—and to protect the public from future potential crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  The application of the so-called "terrorism enhancement" in this case, at U.S.S.G. § 3A1.4(a) (*see* PSR ¶ 86), "reflects Congress' and the [Sentencing] Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.'"  *Stewart*, 590 F.3d at 172-73 (Walker, J., concurring in part and dissenting in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).  As Judge Walker observed in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *Stewart*, 590 F.3d at 181.

The defendant is a radicalized follower of ISIS ideology, who infiltrated the U.S. military and sought to further a treasonous plot to have jihadists ambush and kill his fellow soldiers.  His conduct occurred over a long period of time, was highly calculated and terrifyingly concrete.  He presents a grave and very clear threat to the community and to U.S. national security.  Simply put, the defendant poses an acute, highly significant risk of returning to dangerous crimes.  The

43

defendant's support for a terrorist hate group substantially elevates that risk. As a result, and contrary to the defense's arguments (Def. Ltr. at 29), the risk of recidivism and the need to protect the public weigh heavily and unambiguously in favor of incapacitating the defendant through the imposition of the most substantial possible prison sentence—the Guidelines term of 40 years.

Relatedly, the Court should also reject the defense's argument that the defendant poses little risk to the community. The psychological evaluation report prepared nearly two years ago for the defense by Dr. Schouten asserts that Bridges' actions "were not the result of radicalization to violent extremism in support of ISIS but of multiple other factors that affected his judgment." (Def. Ex. A ("Schouten Report") at 2). But Dr. Schouten's conclusions about the defendant's motivations, history, and mental state are based on the information Dr. Schouten observed, which consisted principally of six conversations with the defendant and reviewing portions of the discovery. Notably, however, the defendant has a history of lying and misrepresenting precisely when it comes to his motivations, history, and mental state. Indeed, even defense counsel notes one such example: "Afraid that his mental health problems might prevent him from being accepted into the Army, Cole abruptly stopped taking his medication and lied about his mental health history on his Army application." (Def. Ltr. at 10). And as Dr. Schouten himself wrote, "Mr. Bridges has a history of making up stories and altering his personal history in order to boost his sense of self, fit in, or impress people." (Schouten Report at 14). More fundamentally, Dr. Schouten's report fails in another crucial aspect: it does not meaningfully engage with the underlying offense conduct and explain why Bridges was willing to murder U.S. soldiers in support of ISIS. Rather, it focuses on Bridges' life before and after the offense conduct to the exclusion of rigorously assessing his conduct during the offense conduct, and it thus leaves unanswered the most relevant questions at

44

this juncture: why did Cole Bridges attempt to murder U.S. soldiers in cold blood and will he do something violent again?

The Government submits that the defendant's actions, statements, and voracious consumption of ISIS and anti-U.S. propaganda speak louder than Dr. Schouten's post-facto words and reflect a steadfast commitment to violence and radical extremist ideology that underscores the risk that he poses. There is absolutely no reason, based on the record of this case, why the Court should have any confidence that the defendant continues to pose anything other than a live threat, necessitating a Guidelines sentence to deter and prevent him from resuming his violent jihadist activities, and to protect the public. The Court should scrutinize the defense's assertion to contrary. For example, the defense boldly claims that the defendant "refused to become part of a supposed plot targeting New York," (Def. Ltr. at 2), a claim belied by the defendant's words and actions, as when he cautioned the OCE — while the OCE was communicating about targets in New York for an attack — to "choose your targets wisely," and commented on how much "firepower" was needed to attack specific government buildings in New York. (PSR ¶ 44). Bridges also noted that government leaders in New York could be "a key target," explaining one plan of action: "that could honestly be a sniper kill and then getting out quietly for a second attack." The sniper, he said, could target "[a]ny person that participates in the gov." (PSR ¶ 44). The defense's sweeping statements about Bridges's conduct and potential for dangerousness

The evidence shows that the defendant was an avowed jihadist who embraced the use of violence for jihadist purposes and that he very intentionally sought information not only about ISIS but also graphic videos of U.S. soldiers being attacked by jihadists. (PSR ¶ 16). Indeed, his internet searches and online posts reflect a consistent consumption of media glorifying the pursuit

45

of violence, further belying any notion that the Court should accept his claims of rehabilitation. Bridges's possession, use, and dissemination of ISIS propaganda and betray his unyielding commitment to jihadism. This motivated the defendant to persist in his conduct for years, and there is no reason to believe he has suddenly divorced himself from that long-held jihadist mission as he approaches sentencing. The assertion that Bridges viewed jihadism propaganda "out of boredom and curiosity" and that the Government cannot know "whether Cole ultimately supported or rejected the conduct depicted" (Def. Ltr. at 13) strains credulity. The defendant pled guilty to providing material support to ISIS and attempting to murder U.S. soldiers on behalf of the terrorist group. Bridges' contention that he "did not find those videos inspiring or compelling" (Def. Ltr. at 13) is self-serving and implausible. The Court should consider this critical context — and the defendant's willingness to minimize his conduct — when assessing the continuing and lasting threat Bridges poses to the United States.

The defendant's willingness to risk his life—his expressed willingness to become a "martyr"—in service of ISIS also underscores the need for a lengthy sentence to incapacitate him. Terrorism crimes come with high recidivism rates and the rehabilitation of terrorism defendants like Bridges is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Up until the week of his arrest, the defendant was actively plotting the ambush of his fellow servicemembers. Bridges absolute commitment to ISIS and the radical ideology that it espouses, along with his aspiration to commit the ultimate sacrifice, to martyr himself for ISIS and its cause, powerfully support a single conclusion: the incapacitation of Bridges should be for the full term of 40 years permitted by statute

46

and called for by the Guidelines.  The fact that Bridges is a young man, fully capable of resuming his jihadist activities, firmly reinforces that conclusion.  Indeed, contrary to his arguments on this score (Def. Ltr. at 25-29), his youth counsels strongly in favor of, not against, the 40-year sentence called for by the Guidelines, in order to achieve the necessary incapacitation in this case.  A less severe sentence will provide Bridges with the opportunity to resume his terrorist activity as a young man, with years to plan and effectuate the attack he sought to carry out before his arrest.

Indeed, a defendant's relative youth has been routinely recognized by courts in terrorism cases as a factor that supports incapacitation for substantial amounts of time to protect the public.  *See, e.g.*, *United States v. Ressam*, 679 F.3d 1069, 1089-90 (9th Cir. 2012) (en banc) (finding sentence reduction of 43 years, or a 2/3 reduction, was unreasonable in a terrorism case, especially where the defendant's release age would be 51 and "[m]ost people are sufficiently active and capable at age 51 to do considerable damage, if they are so inclined").  Similarly, in *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (citations omitted), the Eleventh Circuit explained that, ["a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. "[T]errorists[], [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."

Simply put, a time-served sentence would expose the public to the risk of the defendant's violence.  Bridges' age is squarely in line with the ages of other young men who had committed themselves to radicalized violence, including ISIS followers who have joined the group and attacked and killed in its name.  Bridges chose to radicalize and devote himself to ISIS, and he was

47

prepared to help ISIS kill to further its cause.  His devotion to ISIS was not a flight of youthful fancy.

Significantly, the defendant's inside knowledge of how the U.S. Army plans, trains, and executes its missions not only makes him dangerous, but also an asset to any enemy of the United States.  In this regard,

> [e]spionage differs from all other crimes in one unique, highly significant respect.  The purpose of espionage is political: to undermine the government of the United States with a view to its destruction. This goal is shared by all enemies of this country.

*United States v. Kostadinov*, 572 F. Supp. 1547, 1551 (S.D.N.Y. 1983).  The defendant's proven a willingness to share his training and experience to undermine the military and government that provided it to him.  Not only can the defendant still apply his expertise in service of the nation's enemies – including ISIS as it continues to perpetrate horrors around the world – but that very training continues to make the defendant dangerous and further reinforces the need for a Guidelines sentence to protect the community and the U.S. national security from this defendant.

## C.  The Need to Promote General Deterrence and Respect for the Law

"[G]iven the increasingly common nature of terrorism-related crimes," general deterrence should "play a large part in the court's considerations" at sentencing.  *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018); *see also United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021) ("General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it."); U.S.S.G. § 3553(a)(2)(A)-(B).  This case and others involving violent extremists bent on causing death and destruction currently pose significant security risks to the United States, domestically and abroad. People all over the world considering joining ISIS—or other likeminded organizations—must

understand that, if apprehended, they will be punished to the maximum extent of the law. It is particularly important for the sentence to send an adequate deterrent message given the defendant's specific role as an insider working from within the Army to further ISIS's nihilist mission. Accordingly, the need for general deterrence to mitigate the threat posed by individuals affiliated with jihadist like ISIS is an important feature of this sentencing, amplified by the significant and specific danger posed by insider threat actors, like the defendant, in particular.

As Judge Buchwald explained in imposing a sentence of the statutory maximum of 240 months' imprisonment on a terrorism defendant: "[O]f enormous importance here is that the sentence of [the defendant], even if it were not necessary to deter him, would be justifiable for the reasons of general deterrence. *The message must be loud and clear. Provide or attempt to provide material support and resources to a foreign terrorist organization and you will spend a very long time in jail*." *United States v. Clark*, No. 20 Cr. 76 (NRB), Dkt. 31, Tr. 30-31 (emphasis added); *see also United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021) ("General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it.").

Moreover, the capacity of extremist organizations like ISIS to thrive hinges in large part on their ability to grow their membership—to attract, indoctrinate, and enlist new followers, like Bridges, who are committed to advancing and serving their murderous agenda.  It is only through this support that ISIS and other extremist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, when many young people in the West, including in the United States, have become radicalized by propaganda online.  Notably there has been a documented rise in extremist groups recruiting servicemembers

49

and veterans into their ranks.[7]  This reported, ongoing effort by extremist groups to recruit and radicalize soldiers poses a potential threat to the safety of the American public and to the integrity and strength of the U.S. military.

It is vital for our country's national security that other young men and women in uniform— or those considering joining our armed forces—who have embraced or are considering embracing hateful extremism be deterred from choosing to follow a path similar to Bridges's and engaging in potentially devastating conduct in support of such groups.  It is essential to our nation's security that members of and those contemplating joining extremist organizations know that the consequences for using the military or law enforcement to further extremist aims are the most severe punishments available.  And it is important for the public to know that those who seek to join and support murderous organizations by subverting and threatening the national security will face serious punishment preventing them from causing harm to society and eroding the public faith in our most hallowed institutions.  It is just as vital that the men and women of the armed forces know that acts of treason from within the ranks are met with severe and incapacitating punishment. The defendant knew he had to hide his ISIS affiliation from recruiters and drill instructors and other members of the military during his earliest days in the Army because he was well aware that there was no place in the Army for this extremism.  Others who might, like Bridges, view the

---

[7] *See, e.g., Pentagon Report Cites Threat of Extremism in Military,* Associated Press (Mar. 2, 2021),                                                   https://apnews.com/article/us-news-race-and-ethnicity-72fde7f5168daa205bcad742e425ed50; *The Violent Far-Right Terrorist Threat to the U.S. Military*, Council on Foreign Relations (January 31, 2023), https://www.cfr.org/blog/violent-far-right-terrorist-threat-us-military

military as a training ground must know that such conduct will not be tolerated and that the consequences of pursuing those plans are serious. Similarly, U.S. Government employees with access to sensitive information must be deterred from sharing that information and must understand that the consequences of disclosing such information to facilitate terrorism will be appropriately severe. As evidenced here, disclosure of tactical military information carries real world risks and endangers the lives of other Americans. A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism and espionage offenses.

Similarly, nothing less than a Guidelines sentence is warranted to promote respect for the law. U.S. soldiers—like those who served alongside Bridges—come from different walks of life to serve their country and to work every day to protect our nation. These soldiers risk their lives for us and for our country. They should never have had to face an enemy from within. The sentence imposed in this case must show those platoon members, and all members of the armed services, that their lives and sacrifice are deeply valued, and that decisive action will be taken against those who seek to cause them harm, including—and especially—against those like Bridges who seek to do so from within. The just sentence in this case in light of those considerations is the Guidelines sentence of 40 years' imprisonment.

## II. The Defendant's Remaining Sentencing Arguments Are Unpersuasive

The defendant presents a series of additional arguments minimizing his offense conduct in an effort to obtain leniency. These arguments are belied by the record and the law, and the Court should reject these claims.

51

### A.   A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities

This is an extraordinary case reflecting extreme conduct and serious national security offenses.  The appropriate sentence to meet that conduct is 40 years of imprisonment, consistent with the Guidelines.  That sentence is also necessary to avoid unwarranted disparities across other terrorism cases.  Conversely, the defendant's request for a sentence of time-served would represent precisely such a disparity, one totally out of step with other cases where defendants have been convicted of material support cases, and utterly ignoring the defendant's admission of responsibility for the attempted murder of soldiers.

Fundamentally, this is a case involving an attempt to commit a deadly terrorist attack on Americans.  Defendants in material support cases have frequently received substantial sentences, often the maximum term allowed by statute.  *See Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("Most of these courts chose the maximum material support sentence available to them under federal law . . .").

For example, in *United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.), defendant Adam Raishani – who had voiced support for ISIS for approximately two years – pleaded guilty to one count of attempting and one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 371. Raishani had attempted to leave the United States to join ISIS but had been stopped by law enforcement before he was able to do so. Raishani's Guidelines range was 300 months' imprisonment, the statutory maximum. Judge Abrams sentenced him to concurrent sentences of 240 and 60 months' imprisonment, the statutory maximum penalty on each count.

Similarly, in *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), defendant Sajmir Alimehmeti pleaded guilty to one count of providing and attempting to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 2, and one count of making a false statement in a passport application to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1542. Alimehmeti had radicalized, supported ISIS, and attempted to facilitate the travel of an undercover agent to join ISIS overseas. Alimehmeti's Guidelines range was 360 to 540 months' imprisonment, the statutory maximum. Judge Engelmayer sentenced him to concurrent sentences of 240 and 264 months' imprisonment.

In *United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.), defendant Rafiq Sabir was convicted, following a jury trial, of one count of attempting and one count of conspiring to provide material support to al Qaeda, by providing medical services to al Qaeda personnel. Sabir's Guidelines range was 360 months' imprisonment, the statutory maximum. At sentencing, Sabir requested a sentence of only 60 months' imprisonment, claiming that he had been ensnared by a government sting operation. Judge Loretta A. Preska sentenced Sabir to 300 months' imprisonment.

*Raishani*, *Alimehmeti*, and *Farhane* are only a few examples. Courts have routinely imposed sentences at or near the statutory maximum in numerous other cases involving defendants convicted of providing or attempting to provide material support to FTOs including ISIS. *See, e.g. United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit lone-wolf attacks in United

53

States); *United States v. El Bahnasawy,* No. 16 Cr. 376 (RMB) (S.D.N.Y.) (defendant sentenced to 40 years' imprisonment for plotting to carry out terrorist attacks in support of ISIS in New York City); *United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join AQAP); *see also United States v. Kourani*, 6 F. 4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

The defendant's request for a time-served sentence is completely out of line with the cases cited above and utterly fails to account for the gravity of the defendant's crime. In this regard, a recent decision from the Second Circuit is instructive.  In *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory." *Id.* at 68.  The defendant "herself

54

intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter." *Id.*  However, the defendant was stopped by law enforcement at JFK Airport before she could achieve her goal.  *See id.*  The defendant ultimately pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1).  *See id.* at 68-69.  The defendant's Guidelines range was 360 to 600 months' imprisonment.  *See id.* at 69.  The court imposed a sentence of just 48 months' imprisonment, approximately 13% of the bottom of the Guidelines range.  *See id.*

On appeal by the Government, the Second Circuit vacated the sentence and remanded for resentencing.  *See id.* at 70.  The court's decision was based on several grounds, one of which was that "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law."  *See id*.  In reaching that determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), in which the defendant had a Guidelines range of 360 months' imprisonment, but was sentenced to only 28 months' imprisonment; and *United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019), in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment.  *See Ceasar*, 10 F.4th at 80-82.

Additionally, the court surveyed "the sentences imposed in a handful of recent material support cases," which "illustrate[d] the unwarranted disparity reflected by the 48-month sentence imposed" by the district court.  *See Ceasar*, 10 F.4th at 84.  Specifically, the court cited *United*

*States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.), in which the defendant pleaded guilty to one count of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, based on his posting of violent, pro-ISIS content on social media and his travel to Yemen to join ISIS, and was sentenced to the statutory maximum of 240 months' imprisonment. *See Ceasar*, 10 F.4th at 84-85. The court also cited *United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (WFK) (E.D.N.Y. 2018), in which the defendants each pleaded guilty to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, after one defendant was arrested at JFK Airport while attempting to travel to ISIS-controlled territory through Turkey, and the other defendant was arrested at his apartment shortly before embarking on similar travel. *See Ceasar*, 10 F.4th at 85. The defendants were each sentenced to the statutory maximum of 180 months' imprisonment. These are yet two more cases that, along with the reasoning in *Ceasar*, support the imposition of a Guidelines sentence in this terrorism case.

If anything, given Bridges's position as a member of the U.S. Army, and his willingness to provide U.S. Army tactics and maneuvers to ISIS, his conduct is far more egregious than that of the typical defendant in a terrorism case and more in line, as Probation recognized (PSR at 47), with cases involving servicemembers betraying their country on behalf of extremist groups, including: *United States v. Melzer*, 20 Cr. 314 (GHW) (sentenced to 540 months' imprisonment for attempting to murder U.S. servicemembers, providing and attempting to provide material support to terrorists, and illegally transmitting national defense information); *United States v. Kang*, No. 17 Cr. 446 (KJM) (D. Hawaii) (sentenced to 300 months' imprisonment for four counts of attempting to provide material support to ISIS); *United States v. Hester*, 17 Cr. 64 (DGK) (W.D. Mo.) (sentenced to 236 months' imprisonment for attempting to provide material support to ISIS).

56

The defense's attempts to distinguish these cases are unavailing. These cases involved defendants who were active or former military members when they committed their respective offenses, all involved undercover law enforcement employees, and all involved attempts to help terrorist groups. No two criminal defendants are identical, but these cases — and the substantial sentences each defendant received — underscore how courts treat those who abuse our nation's trust by joining forces with our sworn enemies while in uniform. The cases also underscore how significant and unusual the defendant's insider conduct is, and how necessary significant sentences are to continue to mitigate and defend against that threat, particularly in the ranks of the military.

In the end, the unique attributes of this case and the depravity of the defendant's offense conduct leave it without a perfect analogue in precedent. The defendant betrayed his country in service of a jihadist group, exploited his access to U.S. Army information in order to supply it to terrorists, and plotted to murder scores of innocent American soldiers. The defendant's appalling offenses, coupled with his position inside the military, are exceptionally egregious and call for comparison with notorious traitorous conduct. For these reasons, the only appropriate sentence in this case is the statutory maximum recommended by the Guidelines of 40 years' imprisonment. That sentence would be fully consistent with other terrorism cases involving U.S. servicemembers, and would be the appropriate sentence necessary to avoid unwarranted disparities.

## B. The Totality of the Defendant's History and Characteristics Do Not Warrant Leniency

The defendant's allegedly troubled childhood and mental health issues do not merit a downward variance in this case, especially in the face of the exceptionally aggravating circumstances discussed herein. To the contrary, the totality of the defendant's personal history

and characteristics reinforce that he is a danger to the public, with a meaningful commitment to a violent ideology of jihadist terrorism,

The defendant argues that his troubled past — including his parents' acrimonious divorce, learning that his girlfriend was transgender, alienation from his peers, and his "overseas deployment coincid[ing] with the start of the COVID pandemic — made him the "perfect mark for the FBI's recruitment campaign." (Def. Ltr. at 1-2). First, characterizing the FBI's investigation as a "recruitment campaign" grossly distorts the facts of this case and entirely ignores the defendant's radicalization well before he was ever in communication with OCE and CS. Beyond that, the evidence shows that the defendant's crimes cannot reasonably be attributed to his life challenges, even crediting the defense's account of his upbringing, because he committed these heinous crimes at the exact point in time when the defense claims he was turning things around, when his relationship with his father "was improving" and when he was getting his life "back on track." (Def. Ltr. at 10). And while the Government acknowledges the defendant's mental health issues and struggles with depression (Def. Ltr. at 10), that does not explain or justify his heinous criminal conduct. Many people suffer from depression, and they do not turn to crime, let alone to terrorism.

More broadly, the defendant's military service presented him with every opportunity for success, but his own words and actions from this period show he was cravenly abusing that opportunity for the darkest of aims. The defendant made clear again and again his loyalty to ISIS over the U.S. Army and his determined and consistent focus was on divulging tactics that could be put to use by ISIS. The defendant's entry to the U.S. Army was a tremendous opportunity and a positive chance in his life. He chose to corrupt and destroy that opportunity. He chose to treat

58

that opportunity as a forum to pursue the gravest acts of evil possible: betraying his fellow soldiers; attempting to murder them; and working with purported terrorists to carry out a vile mission to effectuate his deadly plans.

Similarly, the defendant's actions are not convincingly excused or explained away as some fleeting, extreme reaction to the onset of the COVID pandemic and related restrictions.  (Def. Ltr. at 11).  Indeed, the defendant started on this path by researching violent footage on the internet far before the COVID pandemic.  In December 2019 he searched for "us soldier shooting," "ak 47 shooting," "ak 47 downsight," and "badass jihadi."  Similarly, in March 2020, Bridges searched for and watched videos on YouTube entitled, "U.S. SOLDIER COMBAT FOOTAGE, WOUNDED BY TALIBAN SNIPER **GRAPHIC CONTENT 18+**'" and "Truck Hit by RPG." Blaming COVID for a course of conduct that predated the pandemic is illustrative of the defendant's refusal to fully take responsibility for his actions.  And even if COVID did impact the defendant in a meaningful way, the pandemic negatively impacted millions of Americans and hundreds of thousands of servicemembers who did not seek to take up arms with a terrorist group as a result.  This is another effort to minimize his culpability and, if anything, should give the Court tremendous pause as to whether the defendant accepts full responsibility for his crimes and about his recidivism risk.

Bridges' absolute commitment to ISIS and the radical Islamic terrorist ideology that it espouses and his aspiration to commit the ultimate sacrifice — to become a martyr — support a single conclusion: the defendant committed a heinous crime and should serve a lengthy term of incarceration. Whatever the merits of the intervention program described by defense counsel as an alternative to incarceration in this case, the defendant's history, conduct, and abiding commitment

to terrorism all suggest that incapacitation for a significant period of time remains the proper course here.

### C.    The Court Should Reject the Defendant's Attempts to Minimize and Shift Blame

Instead of grappling with the gravity of the crimes he committed, the defendant attempts to cast blame elsewhere or minimize the serious nature of his conduct.  Indeed, the defendant's submission is riddled with minimizations that, at times, inaccurately cast the FBI as the wrongdoer and the defendant as a mere victim of law enforcement overreach.  The Government submits that this downplaying of the offense should concern the Court as it considers the extent to which the defendant has accepted responsibility, has turned a page in his life, and continues to pose a risk of danger.

At every juncture, the defendant lays blame elsewhere.  According to the defendant, and contrary to his plea allocution and prior admissions to both investigators and this Court, he was "against ISIS," (Def. Ltr. at 20) but the Government "pushed him over the line and into criminal behavior." (*id.* at 12).  What's more, the defendant falsely claims that he committed the offenses because the "OCE flirted with him, boosted his ego, and led him to believe they would meet in person one day."  (*Id.* at 14, 17).  The defendant's own statements and conduct flatly contradict these self-serving assertions.  The defendant repeatedly shared sensitive information with purported ISIS members, privately downloaded violent videos and ISIS propaganda to reaffirm the sincerity of his commitment to the group, and eagerly took ownership of what he believed to be a successful ambush involving the death of his fellow servicemembers.  Indeed, the defendant's plea to the chilling offenses of conviction—including *attempted murder* of U.S. soldiers—dispels

60

any notion that his actions could somehow be minimized as an attempt to impress a woman or law enforcement overreach.

The Court should also see through the defendant's attempts to minimize the nature of the information he was willing to provide to terrorists by quoting the defendant's father to assert that all of this information is "open source, unclassified information" that could have been "attained from a simple Google search." (Def. Ltr. at 18). The Government disputes that assertion. While some of the information provided by Bridges is available on the Internet, not all of it is publicly available, including the customized advice he provided about particular U.S. Army techniques and maneuvers. Moreover, just like tips in an insider trading case, the source of the information is what can make otherwise publicly available information particularly sensitive. Here, Bridges — a U.S. Army paratrooper — was willing to provide actionable advice and tactics in the service of ISIS's nihilistic goals. That is incredibly serious conduct deserving of a very serious sentence. And, in many respects, whether the information was publicly available is entirely beside the point; what matters was the defendant's intent—and his intent was clear at every turn: to provide information to ISIS so it could kill.

The defendant also repeatedly, and chillingly, demonstrated his concerted approach to ISIS-inspired violence, used his discretion, and made clear that he was not impressionable and subject to manipulation by the OCE. First, and as detailed above, Bridges was consuming extremist content and publicly posting messages and images on social media intended to convey his support for ISIS and jihadist violence. Those statements and images were dog whistles: clear signs to other ISIS supporters that Bridges understood ISIS enough to post nuanced messages

61

evincing  his radicalization without opening himself to criticism or risk were he to post overt

support for ISIS or terrorist violence as a member of the U.S. Army.

Once contacted by the OCE, Bridges made clear that he had spent considerable time honing

his belief system and articulating his support for ISIS in a way that made it clear he had consumed

ISIS content to speak knowledgeably and to have carved his own identity within ISIS's rubric of

violence and hate.  Bridges spoke to the OCE with clarity of purpose and ideology; for example,

Bridges disclaimed the utility of violence against civilian populations for its tendency to turn

public opinion against ISIS, instead favoring attacks on military targets including his fellow U.S.

Army members.  Far from acting as the eager puppet of the OCE, Bridges made his objectives

clear, and only engaged the OCE's requests when they comported with his self-proclaimed

worldview.  Bridges was not used by the OCE; instead, Bridges thought he was using the OCE to

gain admittance to ISIS, to further attacks on U.S. military members, and to use his knowledge

and access in a clandestine bid to further ISIS's destructive goals.   Accordingly, the Court should

fully consider — and contextualize — the defendant's argument that he should be entitled to

leniency since he "repeatedly rejected the idea that harming civilians was permitted under his

faith."  (Def. Ltr. at 2).  Far from being solely a mitigating factor, this discerning position shows

that the defendant was not some thoughtless brainwashed teenager willing to blindly drink the

proverbial jihadist Kool Aid, but someone who genuinely believed in ISIS's desire to establish a

global caliphate but expressed concerns about one of their most problematic tactics.  But that is a

distinction without a difference, as the Supreme Court explained in analyzing Section 2339B:

> Whether foreign terrorist organizations meaningfully segregate support of their
> legitimate activities from support of terrorism is an empirical question. Congress
> rejected plaintiffs' position on that question when it enacted § 2339B, finding that

"foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." § 301(a)(7), 110 Stat. 1247, note following § 2339B. The record confirms that Congress was justified in rejecting plaintiffs' view. The PKK and LTTE are deadly groups. It is not difficult to conclude, as Congress did, that the taint of their violent activities is so great that working in coordination with them or at their command legitimizes and furthers their terrorist means. Moreover, material support meant to promote peaceable, lawful conduct can be diverted to advance terrorism in multiple ways. The record shows that designated foreign terrorist organizations do not maintain organizational firewalls between social, political, and terrorist operations, or financial firewalls between funds raised for humanitarian activities and those used to carry out terrorist attacks. Providing material support in any form would also undermine cooperative international efforts to prevent terrorism and strain the United States' relationships with its allies, including those that are defending themselves against violent insurgencies waged by foreign terrorist groups.

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010). Notably, unlike the plaintiffs in *Humanitarian Law Project*, Bridges did not provide material support in the form of promoting "peaceable, lawful conduct." Rather, the defendant sought to provide actionable tactics and maneuvers to a deadly terrorist group to help it kill Americans. He posed an extraordinary danger to the lives of American soldiers and the safety and operations of the American military. The defendant's pursuit of death and destruction presents a danger that must be deterred and prevented, to protect the public. The defense's efforts to minimize his conduct and his failure to fully reckon with his responsibility and role in the crimes should give the Court pause as fashions an appropriate sentence.

63

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should impose a sentence of 40 years' imprisonment, as called for by the Guidelines.

Dated:  New York, New York
        October 4, 2024

                                        Respectfully Submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


                            By:     _____/s/_____

                                        Sam Adelsberg
                                        Matthew Hellman
                                        Assistant United States Attorneys
                                        212-637-2494 / 2278


Cc:     Defense Counsel
        (Via ECF)